JOHN BOONEN GRAVES,          *Plaintiff in error,*

against

JOHN B. DASH,          *Defendant in error.*

DASH brought an action of *assumpsit* in the supreme court, as first endorsee of a bill of exchange, against *Graves,* as first endorser. The bill was drawn at *New-York,* the 18th of *January,* 1811, on *Worrall & Williamson,* at *Liverpool* in *England,* for 787*l.* 18*s.* 2*d.* sterling, payable sixty days after sight, and was duly protested for non-acceptance and non-payment.

The cause was tried at the *New-York* sittings in *November,* 1813, before the Chief Justice. The only question at the trial was as to the amount of damages which the plaintiff below was entitled to recover. He claimed the amount of the bill, in the current money of the *United States,* at the rate of 4 dollars and 44 cents for a pound sterling, together with 20 per cent. damages, and interest from the time notice of protest of non-payment was given to the defendant. The counsel for the defendant below objected, and offered to prove that at the time the bill was drawn, bills of exchange drawn at *New-York* on *London* and *Liverpool* were below par; and that the bill in question was purchased by the plaintiff below par; that on the return of the bill and protest, and at the time notice thereof was given to the defendant, the rate of exchange, on *England,* current in *New-York* on bills of exchange purchased and remitted to *England,* was 15 per cent. below par, and that they were as much below par at the time issue was joined in the cause ; that on the return of the bill and notice to the defendant, he offered to pay to the plaintiff the amount of the bill, at the then current rate of ex-

*The holder of a bill of exchange, drawn in New-York on England, and returned protested, is entitled to recover the contents of the bill, at the rate of exchange, or price of bills on England, at the time of the return of the dishonoured bill and notice thereof to the drawer, together with 20 per cent. damages, and interest.*

change on *England*, or price of bills at that time in *New-York*, with 20 per cent. damages, and all charges, or to pay the 20 per cent. damages and charges at the par of exchange, and to furnish a new and approved bill of exchange on *London*, for the amount of the returned bill, or to deliver to the plaintiff another and approved bill, payable in *London*, in lieu of the said bill, at the rate of 120 pounds sterling for 100 pounds mentioned in the protested bill, and to pay all the charges on the said bill. The defendant further offered to prove that it was the usage and custom of merchants in the cities of *New-York* and *Philadelphia*, from time immemorial, to settle and pay protested bills of exchange, drawn in *New-York* or *Philadelphia* on *England*, at the current rate of exchange, or of the price of bills at the time of the return, with 20 per cent. damages, or to furnish a new and approved bill on the same principles. The evidence so offered was objected to on the part of the plaintiff, and rejected by the Chief Justice, as inadmissible, and a bill of exceptions was tendered to his opinion. Under the charge of the Chief Justice, which was also excepted to, the jury found a verdict for 4,928 dollars and 56 cents, being the amount of the bill at the rate of 4 dollars and 44 cents for a pound sterling, with 20 per cent. damages, and the interest.

The bill of exceptions, having been sealed, was returned to the supreme court, pursuant to the statute; and the court below, on the grounds of their former decision on the same question, in [*Hendricks* v. *Franklin*,* gave judgment for the plaintiff on the verdict; on which judgment a writ of error was brought to this court.

*2 Johns. Rep. 119. See also 4 Johns. Rep. 124.*

The cause was argued by *D. B. Ogden* and *T. A. Emmet*, for the plaintiff in error, and by *C. D. Colden* and *S. Jones*, jun. for the defendant in error.

*For the plaintiff in error*, it was contended, that by the common law, the party who is injured by the breach of a contract, or failure to perform it, can recover only the damages he has actually sustained by such breach or neglect. He can claim no more than to be put in the same situation in which he would have been had the contract been performed. The 20 per cent. damages, on protest of such bills, is the settled and adjudged damages for all breaches of such contracts, and the party can

*IN ERROR.*
•••••
**ALBANY,**
April, 1814.

GRAVES
v.
DASH.

Recover no more, unless he waives the benefit of the general rule, and goes into proof of the actual damages he has sustained. Whether the bills were above or below par, the holder of the dishonoured bill might, with the money he received, or the value of the returned bill, and the 20 per cent. damages, go into the market and purchase another bill, and place himself in as good a situation as if the first bill had been paid. Should it be said that the rules of common law do not apply to bills of exchange, which are creatures of mercantile custom and usage, then it is contended that the evidence of the mercantile usage ought to have been admitted.

The original object of bills of exchange was to pay debts abroad, to place funds there, or to transfer funds from a foreign to the party's own country. The right of *redrawing* exists only in the case where the holder of the bill dishonoured in the foreign country, is the *bona fide* owner of it; and in that case he has his election either to seek satisfaction in the country where the drawer resides, or to redraw on him. If he elect the former, he is to receive redress according to the established rules and practice of mercantile men in the country of the drawer. And the practice of the mercantile world is to redeem dishonoured bills at the rate of exchange.

*Re-exchange* is explained by *Chitty;*[*] and it is the law and practice of all commercial countries, unless that of our own be an exception, that where a bill of exchange is dishonoured, it is to be adjusted and paid at the rate of the exchange, at the time. The dishonour of bills results from losses or circumstances not under the control of the drawer. The return of the bill shows that he has or must sustain loss, and if the rate of exchange should be such that the drawer can save any thing by redrawing or purchasing a new bill, justice and policy demand that he should be permitted to do so, since the holder of the protested bill will be *indemnified*, and the loss of the drawer be mitigated. Such is the law and practice of *Europe*. In *Mellish* v. *Simeon*,[†] there was nothing said about the *par of exchange*. Payment was made by a circuitous draft through *Amsterdam* and *Hamburgh*, whereby the drawer had to pay something more than what was expressed on the face of the original bill, but not one fourth of what the par of exchange would have amounted to.

[*] *Chitty on Bills, (2d edit.)* 298.

[†] 2 *Hen. Bl.* 378.

*IN ERROR.*
• • • • •
ALBANY,
April, 1814.

GRAVES
v.
DASH.

The principle of the universal law merchant on this subject is, that the drawer undertakes that the bill shall be paid ; and that, if it is not, he will indemnify the holder, for the failure or breach of contract. The only exception to the rule, is that which has arisen between *Great Britain* and her *colonies.* A certain sum was allowed on all bills drawn in the colonies on the mother country, in *addition* to what the holder would be entitled to receive under the general law merchant. This additional sum was different in different colonies. In *Pennsylvania* and in *New-York,* it was twenty per cent. ; in *Rhode-Island* ten per cent. ; in *India,* ten shillings the *pagoda.*

The law of *Pennsylvania,* which is said to be the foundation of the rule here, was a *colonial* law, and ceased to be of any force when the colonies became independent states. It is true, the act of *Pennsylvania* speaks of bills returned from other parts of *Europe,* but the truth is, that all payments were made through *English* merchants ; it was a law made for the benefit of the merchants in *England.* The amount was to be paid in the same specie as was paid for the original bill, and if not, the value of that kind of coin or money was to be paid ; and it is the relative abundance or scarcity of specie in different countries, which forms the course of exchange; and exchange is *Montesq. Sp.* the fixing the actual value of the specie at the time.*

*Laws,* b. 22. c. 10.

It is not true that the twenty per cent. was given by this colonial law, as an indemnity for all loss, risk, and damages ; it was superadded to the difference of exchange. This was the burden and *badge* of *colonists,* which in no way affects the general law merchant. It was the immemorial usage of redeeming dishonoured bills practised upon, long before this *colonial* law was passed, that the defendant below offered to prove.

The law of the *United States* fixing the value of foreign gold and silver coins, has relation only to the *revenue,* or to transactions between the government and its own citizens. As between them, what is called the *par* of exchange is, no doubt, the proper rule ; but as between our own merchants and those of foreign countries, the *rate* of exchange is the only reasonable and just rule. The reason of the law of the *mint* is, that the pound sterling would always be immutable and invariable in its value. This is fallacious, for a *guinea* and a *pound sterling* are now much below their former value. It is true, courts do not take this depreciation into view ; but merchants, and the

IN ERROR.
....
ALBANY,
April, 1814.

GRAVES
v.
DASH.

mercantile law, invariably calculate on this fluctuation of value.

The evidence offered was *not* to control the law-merchant, but to show, that the rule adopted by the court below was founded on a misconception of that law; and that the old *colonial* statute of *Pennsylvania* was not sufficient evidence of the custom of merchants.

The chance for improper speculation in bills is much greater, if the rule as to the *par* of exchange is established, than if they were to be adjusted at the *current rate* of exchange. The drawer can never know nor foresee what it will cost him to indemnify the holder, in the latter case; and can, therefore, have no temptation to draw on mere speculation : but in the former case, he can make his calculations with perfect certainty.

It is unreasonable that a dishonoured bill should be redeemed at a fixed value, or at the par of exchange, while the buyer of bills purchases at a fluctuating value, according to the current rate of exchange. Bills of exchange are objects of purchase and sale, or a species of merchandise. It would be thought an extraordinary rule, that a person buying goods at their *current* value, should, on failure or defect in the goods, be compensated, not in the *current* value, at the time of such failure, but by some ancient or different value, at some former period. The party damnified is to receive what, at *the time* when he is entitled to an indemnity, the article, in its perfect state, would be worth.

*For the defendant in error,* it was contended, that it never could be reasonable or just to tell the holder of a dishonoured bill, that instead of receiving the 100 dollars, which he had paid for it, he should receive 80 only, which is the result of the rule contended for by the other side. The contract is, that if the drawee does not pay the pounds sterling mentioned in the bill, the drawer, on notice thereof, will pay the same. The only question is, what is the value of a pound sterling ? If its value is fixed by the law of the land, no evidence can be necessary on the subject. Now, the acts of congress relative to duties, and to the *mint*, have fixed this value at four dollars and forty-four cents the pound sterling. *Re-exchange,*

IN ERROR.
.....
ALBANY,
April, 1814.

GRAVES
v.
DASH.

* Du Change,
n. 64, 65, 66.
† Chitty on
Bills, 298, 299.

‡ Slacum v.
Pomeroy,
6 Cranch, 221.

§ Ambler, 672.

as defined by *Pothier*,* *Chitty*,† and other writers, shows the reasons on which the rule as to twenty per cent. damages has been founded.

The notion of *redrawing* is not applicable to the case. If it were, the principle on which it proceeds is not that the holder is to have a new bill from the *drawer*; but the holder of the dishonoured bill, in the foreign country, redraws on the drawer. Otherwise, the convenience of travelling, or purchasing goods abroad, which is the principal object of exchange and re-exchange, would be wholly lost. And the very rule of allowing twenty, fifteen, or ten per cent. damages, on protested bills from abroad, shows that the dishonoured bill was not to be paid by drawing a new bill; for it would very seldom happen that the holder would want his money in *England*, or the *West Indies*.

In *Virginia*,‡ *fifteen per cent*. damages is allowed by statute, and there is no doubt that the rule of allowing twenty per cent. damages in this state has been adopted, in mercantile practice, from the neighbouring states. The case of *Francis* v. *Rucker*§ clearly shows, that, by the law of *Pennsylvania*, the twenty per cent. was given in lieu of all consequential damages, whether exchange, re-exchange, or disappointment in regard to the funds. And the general rule of giving the holder the amount of the bill, at the par of exchange, with the twenty per cent., dispenses as equal justice as it is possible to obtain, in such a variable transaction.

Suppose the holder redraws on the drawer of the dishonoured bill, and thereby gets the exact sum at the place where he wished to have it, can he, afterwards, return to this country, and demand the twenty per cent. damages, because the original bill was dishonoured? Certainly not. This shows, conclusively, that the twenty per cent. is *liquidated damages*, for all the difference of exchange, and every other damage or inconvenience resulting from the protest. It is admitted, that the holder is entitled to the *twenty per cent*. in all cases; but suppose, at the time of the return, bills are forty per cent. below par, what would become of his twenty per cent.? Again, if the drawee sold the bill at twenty per cent. *above* par, and on its being returned dishonoured, bills should be twenty per cent. *below* par, he would make a profitable speculation. To say that the holder shall be obliged to accept a new bill, instead of money, would be to compel him to keep his money abroad, for an

indefinite period, unless he should agree to accept one half the money, perhaps, which he paid for the original bill.

The evidence offered by the defendant below was properly rejected by the chief justice, because usage or custom can never be admitted to show that a less sum shall be a satisfaction of a debt, when *positive* law has fixed it at a larger sum. Usage is admissible, only, to show the nature of a contract, not to extend or alter its effects.

LEWIS, Senator, was of opinion, that the judgment of the supreme court ought to be reversed, and delivered his reasons at length, but which the reporter regrets he is unable to state.

WILKIN, Senator, declared himself to be of the same opinion.

SANFORD, Senator. After the fullest deliberation which I have been able to bestow on this cause, I am of opinion that the judgment of the supreme court was right. It is highly expedient that the amount to be recovered on dishonoured bills of exchange should be determined by a certain and uniform rule ; and such is the rule adopted, and settled by the supreme court. They have rightly determined, that in this, as in other cases of contracts, the rule by which the amount or extent of redress should be ascertained, is a question of law. I forbear to discuss the several rules which have been proposed, or to comment on the arguments which have been urged in support of them. I mean, merely, to state my own conclusion, and to express my approbation of the rule adopted by the supreme court. My opinion, therefore, is, that the judgment below ought to be affirmed.

P. W. RADCLIFF, Senator, declared himself of the same opinion.

YATES, Senator, concurred.

VAN BUREN, Senator, declared himself to be of the same opinion. He thought it safest to affirm the judgment of the supreme

*IN ERROR.*

**.....**

ALBANY,
April, 1814.

GRAVES
v.
DASH.

court, and if the rule adopted by that court was found to be really inconvenient or wrong, the legislature ought to regulate the mode of settling protested bills, by statute.

WENDELL, BISHOP, HAGER, STEWART, TOWNSEND, and VANBRYCK, Senators, concurred.

ELMENDORF, Senator, was of opinion that the judgment of the supreme court ought to be reversed.

HUBBARD, BLOODGOOD, ATWATER, BLOOM, CLARKE, KEYES, TABOR, and ROUSE, Senators, were, also, of the same opinion.

*\* April* 1, 1814.
For *affirming*,
10. For *reversing*, 11.

A majority\* of the members of the court being of that opinion, it was, therefore, ORDERED and ADJUDGED, that the judgment of the supreme court be REVERSED, &c. ; and that the said *John B. Graves* recover his costs, &c. And the record be remitted, &c.

<div align="right">

Judgment of reversal.