SCHERMERHORN *vs.* THE AMERICAN LIFE INSURANCE AND TRUST COMPANY and others.

C., L., and others having contracted with the Holland Land Company, for the purchase of a large tract of land belonging to the latter, and being unable to make their payments upon the contract, they in 1837 applied, through S., one of their number, to several moneyed corporations, for money. Being unable to obtain it elsewhere, S. applied to the Am. Life Ins. and Trust Co. for means or aid to enable the associates to fulfill their contract. S. received encouragement that on perfecting arrangements to establish suitable correspondents in London, the company would be able to take a deposit of the lands agreed to be purchased, and advance, by their certificates or bonds, the funds necessary to pay for it, &c. In the meantime an arrrangement was made, by which bonds or certificates were issued by the Trust Co. to S. and his associates, for £12,000 sterling, for the security of which a bond was given, made by S. and his associates, payable in a short time. It was known to both parties that those certificates could not be immediately converted into money at par, but that the amount of money required could be raised on them by hypothecating them; and they were hypothecated to B., for that purpose. In the course of the same year, and the next, an arrangement was made between the parties, for a further advance of certificates by the Am. Life Ins. and Trust Co. to an amount sufficient to enable the associates to pay off their debt to the Holland Land Co. and entitle themselves to a conveyance of the lands, which were to be conveyed to D., R. and S. in trust to pay the Trust Co. its advances, with interest and charges, and then to be conveyed to the associates. The certificates were to bear an interest of five per cent, and be payable in London in pounds sterling, in twenty years from their date, with interest payable there, semiannually. In July, 1838, the Trust Co. issued to the associates further certificates, to the nominal amount of £35,700, which, with those before issued, amounted to the sum of £47,700. They were estimated and paid to S. at a premium of six per cent upon $4,44 to the pound sterling, which was about $4,71 for the pound sterling, and were all, pursuant to a previous arrange-

ment known to the officers of the Trust Co., sold by the associates, to B. at $4,44 to the pound sterling, and the proceeds, or sufficient for that purpose, were paid to the Holland Land Co. upon the contract.   The associates had previously agreed upon an equitable severance and partition of the lands, &c. among themselves, according to their respective interests therein ;. and their respective portions of the debt due to the Trust Co. were also liquidated and settled, so that each one owed his portion of the debt in severalty. Each of the associates then, for the purpose of securing the debt due to the Trust Co., gave his individual bond to the Trust Co. for his portion of such debt.   The plaintiff, who was one of the associates, gave his bond, dated July 10, 1838, conditioned for the payment of $151,933,44 in ten years, with interest at the rate of seven per cent, per annum, payable semi-annually.   And further to secure the Trust Co., the associates directed the Holland Land Co. to convey the land directly and absolutely to D., R., and S. in trust to be held and disposed of, first for the payment to the Trust Co. of the amounts due on the bonds of the associates.   D., R. and S. then executed a declaration of the trusts upon which they held the land, specifying the amount of each associate's part of the debt, as mentioned in his bond, and his individual share of the property, and containing covenants to convey his share of the property to the owner, when his part of the debt should be paid.

On a bill filed by the plaintiff, in equity, against the Am. Life Ins. and Trust Co. and others, for the purpose of setting aside the bond given by him to the Trust Company ; and of having the conveyance made by the Holland Land Co. to D., R. and S. declared void ; on the ground that the consideration of such bond and conveyance was usurious, and the transactions on which they were founded unauthorized and illegal

*Held,* 1. That the contract between the associates and the Am. Life Ins. and Trust Co. was, on the part of the Trust Co., usurious and void as against the plaintiff.

2. That the bond given by the plaintiff to the Trust Co. was void as against the plaintiff; and it was ordered to be given up and cancelled.

3. That the trust claimed and attempted to be raised in favor of the Trust Co. upon the deed from the Holland Land Co. to D., R. & S. was void. And the trustees were directed to convey to the plaintiff his share of the property, and to account to him for the money or property received by them under the trust.

4. That the plaintiff was a *borrower*, within the 4th section of the act of May, 1837, and therefore was under no obligation to pay, or offer to pay, any part of the sum or thing loaned, as a condition of obtaining relief.

*Held also,* that the fact that the plaintiff had been for a time divested of all his property, by proceeedings in bankruptcy, did not divest him of the character of a borrower.   But that on re-purchasing the property at a sale thereof by the assignee in bankruptcy, he became reinstated in his former character and rights.

Schermerhorn *v.* American Life Ins. and Trust Co.

IN EQUITY. This bill was filed in the supreme court, in equity, in January, 1848, for the purpose of setting aside a certain bond for $151,933,44, given by the plaintiff to the American Life Insurance and Trust Company; and of having a certain conveyance made by the Holland Land Company to trustees for the security of the payment of the money mentioned in the bond, declared void; and the property mentioned in that conveyance conveyed to the plaintiff, and the money received upon that property by the trustees paid over to the plaintiff—on the grounds that the transactions on which the bond and conveyance were made, were, on the part of the American Life Insurance and Trust Company, unauthorized and illegal, and in themselves void by the laws of this state; and also, on the ground that the consideration upon which the bond and conveyance were made was usurious, and the bond and conveyance therefor void, in the hands of the company or its assignees. The whole transaction alluded to by this case is extensive and somewhat complicated; but the following brief statement, it is believed, will sufficiently show its general nature and scope, to enable the reader to examine and appreciate those particulars upon which the plaintiff's complaint was founded.

It appeared that in the summer and fall of the year 1835, Col. John Watmough, of Philadelphia, had a correspondence, by letter, with John J. Vanderkemp, the general agent, in the United States, of the original proprietors of the lands in Chautauque county, commonly called the "Holland Land Company," for the purchase of the unsold lands in that county, the executory contracts which had been given for lands, and the unpaid bonds and mortgages which had been received for the purchase money of lands which had been sold. This epistolary correspondence had resulted in an agreement for the sale and purchase of the property, and a general understanding of the terms of such sale and purchase; and on the 19th of October, 1835, Mr. Vanderkemp transmitted the correspondence to David E. Evans, Esq. of Batavia, the local agent of the Holland Company, for the purpose of obtaining the schedules and statements necessary to the making of a more complete and perfect contract, upon the completion

of which $250,000 were to be paid, the whole purchase money being estimated at about $1,250,000. About this time, Col. Watmough sold and assigned his interest in this inchoate contract with the Holland Company to Trumbull Cary and George W. Lay, of Batavia, for $6000, which they paid, and thereby became entitled to the interest of Col. Watmough in the contract with the Holland Company. Soon after this, Cary and Lay associated with them, in the contract for the purchase of the Chautauque property, William H. Seward, Jared L. Rathbone and Abraham M. Schermerhorn; and thereafter the purchasers were called the associates, their interest being in the proportions following: Abraham M. Schermerhorn, two-ninths; Trumbull Cary, two-ninths; George W. Lay, one ninth; Jared L. Rathbone, two-ninths; and William H. Seward, two-ninths. On the first of October, 1836, the Holland Company made a written contract with the associates, based upon the negotiation originally commenced with Col. Watmough, recognizing the rights of the associates under their several transfers, stating the whole purchase money of the Chautauque property at $919,175,59, which was divided into four payments, giving the associates credit on some of the payments which were due and partly paid, and liquidating the payments to be thereafter made; by which the associates were to give their notes, on or before the 20th November, 1836, for $173,803,83, payable in ninety days, and to pay $229,793,98, and interest at *five per cent per annum*, on or before the 31st of March, 1837; and $229,793,98, and the like interest, on or before the 31st of December, 1837; amounting, in the whole, to $633,391,70, upon the payment of which sum the Holland Company were to convey the property to the associates. Soon after completing this arrangement, the associates, anticipating their inability to make their payments to the Holland Company, from the sales of the land, and the collections on the contracts, and bonds, and mortgages, set about making negotiations to procure the money to meet their contract, by other means. These applications and negotiations were, on the part of the associates, principally conducted and managed by William H. Seward, Esq. He applied to several moneyed corporations for money,

but being unable to obtain it, he applied to the American Life Insurance and Trust Company for means or aid to fulfill the contract for the Chautauque property. This company was a corporation under the laws of Maryland, with a capital of $2,000,000, and had by its charter, among others, the following specified powers : 1st. To receive endowments of real, personal, or mixed property for a term of years or life or lives in trust. 2d. To grant and purchase annuities. 3d. To contract for reversionary payments. 4th. To receive from any free person any deposit of money or securities valued as money, in trust, and to allow interest thereon. 5th. To make all kinds of contracts in which the casualties of life or interest of money were involved. 6th. To provide for the investment of the funds of the company, other than the moiety of its capital for which a different investment was, by its charter, before directed, in such stocks, or real or personal securities as they might deem proper. 7th. To make insurances on lives and property. 8th. To accept and execute all such trusts as might be committed to them by the courts of the state of Maryland. 9th. To appoint all such officers, agents and servants as they should deem necessary to conduct and execute the business and affairs of the company, and to define their powers and duties. 10th. To fix the places and modes of transfer of certificates of stock, deposits or payments of interest. And lastly, to make by-laws, &c. But the company was not to issue, for circulation as money, any of its own promissory note or notes, in the nature of bank notes, or certificates of deposit payable to bearer, or to guarantee in any manner whatever, the payment of any chose in action, other than promissory notes or bills of exchange previously discounted or purchased and then held by the company or its agents ; nor to make any contract which, by the existing laws (of Maryland,) amounted to usury ; or to hold only such real estate as should be necessary for the convenient transaction of business. (*See Charter as amended December,* 1837.) The American Life Insurance and Trust Company had a president, secretary, some of its trustees, and an office, in Baltimore ; and a vice president, assistant secretary, some of its trustees, and an office, in the city of New-York, where it did a great part of its

business. At the time the application hereinafter mentioned was made, on behalf of the associates, to the officers of the American Life Insurance and Trust Company, at New-York, the business transacted by the Trust Company at New-York, was the loaning of money on bond and mortgages and securities; insuring lives; receiving deposits of money in trust on interest; they dealt to some extent in the purchase of domestic bills of exchange; purchased large amounts of state stocks; and drew and sold bills on London to a considerable extent; they made loans on promissory notes secured by collaterals hypothecated; they occasionally purchased bills on London, and they also issued large amounts of certificates of deposit, when the money was not in fact deposited. The Trust Company had recently given notice in a pamphlet which they had published, that they loaned money on bonds and mortgages, stocks and other securities. In the early part of 1837, Mr. Seward, on behalf of the associates, applied to the officers of the Trust Company, at New-York, for money, or means to raise money, to meet their contract with the Holland Company. In reference to this application and the negotiations and transactions which followed, Mr. Seward stated in his answer, and in his testimony, in substance, as follows: The terms of the contract between the associates and the Holland Land Company, required payments to be made faster than the proceeds of the estate would furnish means, and the associates desired to obtain money to pay the Holland Company and other liabilities that Lay and others had incurred, and which rested on them and their associates. I went to New-York, I think as early as 1837, for the purpose of raising funds for my associates and myself to pay on the contract above mentioned, and I was there repeatedly and long on that business. I cannot say certainly that I made applications for loans in more than two places, and yet I think likely I did. I knew at that time John Duer and Morris Robinson. I then learned that they had some connection with the American Life Insurance and Trust Company. I learned the fact that the American Life Insurance and Trust Company had an office in the city of New-York. *I was there to get money, to get money somehow*, and I understood that they

assumed trusts and advanced money on them. *I communicated to the officers of that company, my desire on behalf of myself and associates to raise money.* I went on one or more occasions before the committees of that company and conversed with them on the subject. In those preliminary negotiations I received encouragement that on perfecting arrangements to establish suitable correspondents in London, the company would be able to take a deposit of the Chautauque estate, and advance, by their certificates or bonds, the funds necessary to pay for it, and to pay the other liabilities of the company (associates.) While this general arrangement was under negotiation, an arrangement was made and concluded about the month of September or October, 1837; under which *bonds or certificates were issued to me and my associates for twelve thousand pounds sterling,* for the security of which a *bond was given, made by me and my associates, payable in a short time.* Mr. Duer had returned from Europe and superintended the issuing of the company's certificates at the company's office, in New-York. It was known, both to Mr. Duer and the witness, that these certificates could not be immediately converted into money at par; but that the amount of the money required could be raised on them by hypothecating them, and they were hypothecated to Nicholas Biddle for that purpose. After the receipt of the £12,000 in certificates, the negotiation was continued with the American Life Insurance and Trust Company, on behalf of the associates, for the purpose of raising a further amount of money, and in the course of that year and the next, was consummated by an arrangement for the advance of a further amount of certificates; the general features of which were, that the American Life Insurance and Trust Company should advance certificates to an amount sufficient to enable the associates to pay off the debt to the Holland Company, and entitle themselves to a conveyance of the Chautauque estate, which was to be conveyed to John Duer, Morris Robinson and William H. Seward, in trust, to pay the American Life Insurance and Trust Company its advances, with interest and charges, and then to be conveyed to the associates. The certificates were to bear an interest of five *per cent,* and be pay-

able at London in pounds sterling, in twenty years from their date, interest to be payable at London semi-annually.

About the first of July, 1838, the American Life Insurance and Trust Company issued to the associates further certificates in the form of those before issued, to the nominal amount of £35,700, which, with those before issued, amounted to the sum of £47,700. All the certificates were numbered, and each purported to certify that some person, naming him, had deposited with the American Life Insurance and Trust Company the sum of one thousand pounds sterling, for the period of twenty years, commencing at a specified time, and irredeemable for that period; interest to be paid thereon by the company half-yearly, on specified days, at the rate of five per cent per annum, upon the presentation of the warrant annexed, at the agency office of the company in London. At the end of the time of deposit, the said principal sum with the interest then due to be paid to the depositor, or his order, at the said agency office, upon the surrender of the certificate. The certificates were all signed by P. Macauley, president, and R. D. Wilson, secretary, some of them by John Duer, and some of them by M. Robinson, vice president, at New-York. There was subjoined to each certificate a warrant as follows :

"Warrant for 25 pounds sterling payable at Prescott, Grote, Ames & Co., London, for half-yearly interest, due the —— day of —— 184-, for certificate No. —— of the American Life Insurance and Trust Company, £25.

  Signed,         "N. Thurston, Ast. Secty."

P. Macauley was president, and R. D. Wilson, secretary of the American Life Insurance and Trust Company, at Baltimore, and John Duer and M. Robinson, respectively, were vice presidents, and N. Thurston, assistant secretary of the Trust Company, at New-Yerk. These certificates were all issued or delivered to Mr. Seward, at the office of the Trust Company at New-York, and were estimated and paid to him at a premium of six per cent upon $4,44, to the pound sterling, which was at about $4,71, for the pound sterling, and were all, pursuant to a previous arrangement, known to the officers of the Trust Company at New-York, sold by the associates to Nicholas Biddle,

of Philadelphia, in July, 1838, at $4,44 to the pound sterling, and the proceeds, or sufficient for that purpose, paid to the Holland Company in performance of the contract of the associates, for the purchase of the Chautauque estate. The associates had before this time agreed upon an equitable severance, and partition of the Chautauque property, including the lands, contracts, and bonds and mortgages, among themselves, according to their respective interests therein; and their respective portions of the debt due to the American Life Insurance and Trust Company, for these certificates and advances made by them, and their charges thereon, were also liquidated and settled, so that each one owed his portion of the debt in severalty. When in July, 1838, the associates performed their contract with the Holland Company, so as to entitle them to a conveyance of the Chautauque property, and for the purpose of securing the payment of the debt due to the American Insurance and Trust Company, for their advances so made as aforesaid, each of the associates gave his individual bond, to the Trust Company, for his portion of the debt, payable in ten years, with interest at the rate of seven per cent per annum, payable semi-annually at New-York. Upon which Abraham M. Schermerhorn, the plaintiff, gave his bond dated the 10th day of July, 1838, conditioned for the payment of $151,933,44, with interest at the rate of seven per cent per annum, payable semi-annually, which was the bond set forth in the plaintiff's bill, and against which he prayed relief. And further to secure the American Life Insurance and Trust Company, and pursuant to an assignment of their contract with the Holland Company, previously made for the same purpose, the associates permitted and directed the Holland Company to convey the Chautauque property, directly and absolutely, to John Duer, Morris Robinson and William H. Seward, in trust, to be held and disposed of, first for the payment of the American Life Insurance and Trust Company, the amount due on the bonds of the associates. And the said John Duer, Morris Robinson, and William H. Seward, thereupon executed a declaration of the trusts upon which they held the Chautauque property, specifying the amount of each proprietor's part of the debt as mentioned in

his bond, and his individual share of the property, and containing covenants to convey his share of the property to the owner when his part of the debt should be paid. It was also declared by the declaration of trust that, whenever A. M. Shermerhorn, the plaintiff, should offer the American Life Insurance and Trust Company, any bond and mortgage taken by the trustees, which should secure with semi-annual interest, the sum therein mentioned, upon occupied and improved land, worth double the amount secured, to be estimated by persons appointed by the company, the amount of such bond and mortgage should be applied in payment of the bond of the said Abraham M. Schermerhorn. The plaintiff also asked that the trust attempted to be raised, in favor of the trust Company, upon the conveyance from the Holland Company to Mr. Duer and others, be declared void as against the plaintiff, and his share of the property, held under that conveyance, be conveyed to him; and that the trustees account for and pay to the plaintiff his share of all the property received by them under or by virtue of the said conveyance. It also appeared by the pleadings and proof that A. M. Schermerhorn, after the above mentioned transaction with the Trust Company, applied for and obtained the benefit of the bankrupt law, and that his property thereby passed to his assignees, and that he, afterwards, and before the commencement of this suit, and before the trustees had collected any money on the Chautauque property, reacquired and became reinvested with the same property, and still owns and holds the same; and these facts were set up against the plaintiff's recovery. The plaintiff on the argument insisted on several objections to the legality of the matters involved in the case, among which were the following:

*First.* That the transactions on the part of the Trust Company were not within the powers granted to them, but were foreign to and inconsistent with the objects of the charter.

*Second.* That the transactions were not only unauthorized, but were contrary to both the implied and express provisions of the charter.

Schermerhorn v. American Life Ins. and Trust Co.

*Third.* That the transactions were illegal, being against the policy of the constitution and laws of the state of New-York.

*Fourth.* That the contract was, moreover, contrary to the express prohibitory and penal statutes of the state.

*Fifth.* That the transaction between the plaintiff and his associates, and the American Life insurance and Trust Company, was usurious.

*Sixth.* That independent of all questions affecting the validity of the bond, the trust for the security of the corporation was void.

The New-York Life Insurance and Trust Company was made a party, on the ground that it held in deposit the money which had been received by or under Messrs. Duer, Robinson and Seward, from or on account of the Chautauque property, and Edward Fletcher, James Alexander, Charles Kerr, Charles Dashwood Bunn, Christopher Pearse, Charles Philip Fletcher, John Abel Smith, Oswald Smith, Abel Smith, Samuel George Smith, George Robert Smith, James Morrison, Alfred Morrison, Charles Morrison, Patrick Macaulay, George F. Tallman, William Bard and William S. Wetmore, were made defendants on the ground that they had or pretended to have some interest in the Chautauque property, or the plaintiff's bond by or under assignments or transfers of the American Life Insurance and Trust Company, or Messrs. Duer, Robinson, and Seward, as trustees for that company. The case was argued by

*John L. Talcott,* for the plaintiff.

*S. G. Havens & Geo. F. Tallman,* for the defendants.

MULLETT, J. delivered the opinion of the court. The most important subjects of consideration suggested by this case, are those which are founded on the allegations of usury made by the plaintiff, and I propose to confine my examination to these subjects. The question of usury is presented to us in one of its most complex and intricate forms ; and although the difficulty of its decision ought not to be considered increased, it is certainly not diminished by the contemplation of the great amount of

property involved in the controversy. This is claimed to be a case of usury in disguise, or a loan of money for an illegal rate of interest, diguised under the form of some other transaction, which would be lawful in itself. The first step in the examination of such a subject, includes an inquiry into the nature and substance of the transaction, the real intention and object of the contracting parties, not whether they intended to violate the statutes of usury or not, but whether the substance and design of the contract which they *did* make was, directly or indirectly, a borrowing of money on one side, and a lending on the other, at a greater rate of interest, reward or profit, than is allowed by law. Lord Mansfield, nearly a hundred years ago, in applying the English statute of usury (from which ours is substantially taken,) to a case before him, declared that " when the real truth was a loan of money, the wit of man could not find a shift to take it out of the statute." (*Flower* v. *Edwards, Cowper's R.* 114.) Since the above remark of the learned and able expounder of English commercial law, the judicial experience of that country, and of this, has proved that human cupidity is not easily restrained by legislative enactments or judicial admonition. The statute against usury, as a law, is simple and plain, and very few attempt a direct violation of it; and yet there is hardly a term of the court, in which questions involving an indirect violation of the usury laws—rendered intricate and difficult by the ever-waking ingenuity of human avarice—are not presented for consideration. When both the facts and the law are submitted to the same tribunal, these cases, more than almost any others, require in the court a clear knowledge and due appreciation of the principles and policy of the law by which they are governed, and a firm independence in their application. In the investigation of questions of usury, the court have not the aid of those perceptions of natural justice, which frequently, as if by intuition, guide to just conclusions. There is nothing in ethics, disconnected from its injunctions to obey the municipal law, to show why a man may not, short of absolute extortion, demand one *rate* of interest for his money, as well as another; nor why he may not speculate upon the loan of his *money*, as

Schermerhorn *v.* American Life Ins. and Trust Co.

well as upon the sale of his other property. The laws against usury are mere positive enactments, and yet are founded upon just and wise principles of public policy, and rendered necessary by the artificial character which is given to money, and which makes it the measure of all value, the representative of all other property and a tender for all pecuniary obligations ; in short, which makes it capital of the most powerful and desirable kind. The statutes are made to protect the industrious, enterprising, and producing classes of the community, against the unjust exactions of mere money holders. Commerce, manufactures, and all the arts of civilized life which produce or improve property for the use of man, require capital in their prosecution ; and if the holders of capital were left to fix their own price for the use of it, they might, without embarking in the hazards of business, monopolize all of its profits, and discourage all enterprise. Therefore, experience suggested and sanctions the propriety of fixing, by law, the rate of interest which may be demanded for the use of money. This is the view which Lord Bacon takes of the policy of usury laws. He concludes a discussion on the subject, by remarking that in fixing the rate of interest, two things are to be considered, "the one that the tooth of usury be grinded, that it bite not too much ;" "the other, that there be left open a means to invite moneyed men to lend for the quickening of trade." (*Moral Essays*, 41.) Lord Redesdale, 1803, in speaking of the policy of the English statute of usury, said, "It was intended to protect distressed men, by facilitating the means of procuring money on reasonable terms, and by refusing to men who sit idle, as high a rate of interest for money without hazard, as those can procure who employ it in the hazardous undertakings of trade and manufactures." (1 *Sch. & Lef.* 195, 312.) This is the policy which Chancellor Kent, in a very able examination of the subject, says has resisted with equal firmness the decrees of the church and the speculations of philosophers; which is now adopted by all the commercial states of Europe, and which has the sanction not only of our own municipal law, but of the most enlightened human reason. (16 *John.* 377.)

Our statute on the subject of the interest of money is founded on the same policy, of restraining the inordinate desires of money lenders, for the sake of those who are necessitated to use money. By the 1st section, it is declared that "the rate of interest upon the loan or forbearance of money, goods or things in action, shall continue to be seven dollars upon one hundred for one year, and after that rate for a greater or less sum, for a longer or shorter time." By the 2d section, "no person or corporation shall, directly or indirectly, take or receive, in money, goods or things in action, or in any other way, any greater sum or greater value, for the loan or forbearance of any money, goods or things in action, than is above prescribed." And the 5th section, as amended in 1837, declares that "all bonds, bills, notes, assurances, conveyances, all contracts and securities whatever, (except bottomry and respondentia bonds and contracts,) and all deposits of goods or other things whatsoever, whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum or greater value for the loan or forbearance of any money, goods or things in action, than is above prescribed, shall be void." This statute applies only to contracts for *loans* or *forbearance*, and yet in some cases it seems to be considered as applicable to contracts of a different nature, and to be a kind of *panacea* for the evils of all hard and oppressive bargains; while in other cases, it appears to be supposed that if the contract does not use the terms or forms of a loan of forbearance, it avoids the law. Both of these injurious extremes will be avoided by applying the statute according to its language and policy. There is nothing in the policy or language of this statute, which has reference to, or attempts to interfere with, buying, selling, exchanging or dealing in any kind of property which may be the subject of such transactions, in the ordinary course of such business, whatever may be the price or value at which such property may be estimated, or whatever may be the sacrifice which the purchaser may see proper to make to convert his property into money, though the form of all those transactions may be used to disguise usury. Nor can usury be made out merely by showing that the pur-

chaser of property sustained a loss by attempting to raise money upon it, even though it appears that the seller knew that the property was purchased for that purpose. The proof must go further, and show that the pretended sale was in truth and in substance a loan of money disguised under the form of a sale, by the plan and terms of which the seller attempted to obtain, either for himself or for some other person, a greater profit upon the value of the thing parted with, than the rate of interest allowed by law. In order to make the borrower's losses material to the question of usury, it must appear that they in some way contributed to the lender's gain, either for himself or some other person. He is the one upon whom the statute operates, and who is thereby forbidden to receive more than the legal rate. This is not only the language of the statute, but the proposition is in accordance with its policy. (*Dagnall* v. *Wigley*, 11 *East*, 43. *Coster* v. *Dilworth*, 8 *Cowen*, 299. *Stevens* v. *Davis*, 3 *Met. Rep.* 211.) Nor does the remark of Mr. Justice Johnson, in his opinion in the case of the *Bank of the United States* v. *Owen*, (2 *Peters*, 536,) controvert or qualify the principle of the above proposition. In that case, the bank, which imposed the usurious terms on Owen, was itself the lender, and stipulated for the profits of the illegal exaction. Whenever the forms of legitimate business transactions are alledged to be used to disguise or cover usurious loans, the question presented is one of fact, to be determined by the proof of the facts and circumstances peculiar to each case. Therefore, the decision of one case is seldom a precedent for the decision of another. And this may explain why there is brought before the courts such an apparent variety, and great multiplicity of cases on the subject of usury, which really involve no dispute about the law. There is another feature in the statute which has, in some instances, led to a misunderstanding of its meaning. The statute, apparently, speaks of goods and things in action, as the subjects of usurious loans, and therefore it has been supposed that a loan of goods, to be returned or repaid in kind, was a loan within the statute. (*Spencer* v. *Tilden*, 5 *Cowen*, 144. *Homes* v. *Wetmore*, *Id.* 149. *Cummings* v. *Williams*, 4 *Wend.* 679.

*Hall* v. *Haggart & Reynolds*, 17 *Id.* 280; *and Bull* v. *Rice*, *MS. opinion of supreme court of* 8*th district, by Sill, J.*) In all these cases, except the last, the supreme court decided that the contracts were not usurious, for the reasons assigned, but in none of the cases was the decision put upon the ground, that such contracts were not within the statute. And the judges frequently assert, without qualification, that the statute includes the loan of goods and chattels. Even Mr. Justice Welles, in his excellent opinion in the case of the *Farmers' Loan and Trust Co.* v. *Carroll*, (5 *Barb.* 658,) says, "I hold it to be law, that in all cases of a loan, where it appears upon the face of the transaction that the lender is in any manner to receive more than the legal rate of interest as a compensation for the forbearance of the thing loaned, *whatever the thing may be,* it is usury *per se.*" But neither this learned judge, nor any other, has ever told us how, in the case of a loan of things which have no express money value, it can appear upon the face of the transaction, that the lender is, in any manner, to receive more than the legal rate of interest as a compensation for the forbearance of the thing loaned. Suppose that a merchant should have lent his neighbor 100 barrels of flour, for which he was to receive 107 in a year. The flour when it was lent was worth only $3\frac{50}{100}$ a barrel, but when it was to be paid, it had risen to $5,00 a barrel, would any one say that that contract was usurious, and yet the lender made $185 on his loan of $350 for a year. If in the next year he had loaned at the same rate, he would probably have lost $150 in the value of his capital, besides his interest. This is the case with all property which has not a fixed uniform money value; nothing but money has that uniformity of value in contemplation of law, or can be made the basis of arithmetical calculation upon which to estimate profits or gain, or to which the terms of the statute, such as "*rate* of interest," "seven dollars upon one hundred, for a year," "value," "forbearance," &c., can be applied with any definite meaning. In short, money is the aliment of usury. If there was no money, either in fact or in contemplation, there could be no usury. The construction of the statute, in reference to the loan of goods

Schermerhorn *v.* American Life Ins. and Trust Co.

or things in action, is explained and illustrated by Judge Gardiner, in his very able opinion, written at the suggestion of a majority of the members of the court of appeals, and adopted by them in the case of *The Dry Dock Bank* v. *The American Life Insurance and Trust Company,* (3 *Comst.* 354,) in a way and with a clearness which renders all further examination of the subject not only unnecessary, but supererogatory. In that case the learned judge comes to the conclusion, that the statute against usury, and prohibiting a greater rate of interest than seven *per cent,* for the loan or forbearance of any money, goods or things in action, is applicable only to loans which are in substance and effect loans of money. That a loan of goods or things in action is within the statute only when it is indirectly a loan of money. Upon this ground, the court of appeals has reversed the judgment of the supreme court in the case of *Bull* v. *Rice,* MS. opinion, by Gardiner, J. These decisions have cleared away the mist which has so long hung over the subject of loans of goods and things in action, and it now appears to be brought out into the clear light of judicial decision. We now perceive that a loan of money may, indirectly, and in substance and effect, be made in goods or things in action, and be within the statute of usury. The cases of this kind are when the borrower desires money, and the lender proposes or consents to gratify his desires by letting him have something else than money in lieu of money. In such cases the thing loaned is estimated and valued in money; the estimated value forms a basis upon which to compute the interest reserved. The principal and interest are generally to be paid in money or something estimated or measured by money. This is clearly in substance and effect a loan of money. In these cases it is evident that the things substituted for, and loaned as money, must be truly estimated and valued at their money value. Any material over-estimate is regarded as, and in fact is, a contrivance by the lender to obtain a greater rate of interest or profit, for the money which he really parts with, than the rate allowed by law, by the amount of the over-valuation, and the interest charged thereon. Such contracts, when proved, have always been held usurious and void,

The number and uniformity of the decisions declaring such transactions usurious and void, would render a reference to them all unnecessary, and in danger of being considered an attempt at display. The following are some of the decisions in this state, containing references to other decisions holding the same principle: (*Rose* v. *Dickson*, 7 *John.* 196; *Eagleson* v. *Shotwell*, 1 *John. Ch.* 536; *Morgan* v. *Schermerhorn*, 1 *Paige*, 544; *Seymour* v. *Strong*, 4 *Hill*, 255; *S. C. in error*, 7 *Id.* 444 *to* 463; *The Farmers' Loan and Trust Co.* v. *Carroll*, 5 *Barb.* 658; *The Dry Dock Bank* v. *The American Life Insurance and Trust Co.*, 3 *Sandf. Ch.* 215; *S. C. in the court of appeals*, 3 *Comst.* 344.) Money is not only considered as having a fixed uniform value in itself, but its use is regarded as having a certain value, so that money in hand is, in contemplation of law, worth more than money at a future time, however well its payment may be secured. If I withhold my creditor's money beyond the time at which I ought to have paid it to him, the law compels me to pay him for the use of it, or for depriving him of the use of it. The statute of usury also graduates the rate of interest allowable with reference to the time of the forbearance of the loan. Questions of interest and consequently of usury, include considerations of time as well as of amount and rate. Therefore a man may commit usury by demanding interest for too long a *time*, as well as on too large an *amount*, or too high a rate. If in making out a loan, I should lend a note against a third person for $100, payable in one year, *without* interest, and take the borrower's note for the same amount, payable at the same time, *with* interest, I should get the advantage of the borrower by the amount of the discount on the note which I loaned, and the transaction would be usurious. The same would be the result if I should loan my own note payable at a future time, as money, simply because I should in both cases demand interest on a larger sum than I actually loaned, deducting the discount, or for a longer time than I parted with my money. An agreement on discounting a bill, that the borrower should take in part payment another bill which had time to run, as cash, although the full discount was taken, was held

to be usurious, in *Parr* v. *Ellason*, (1 *East*, 92.) The same principle was recognized in *Hammet* v. *Yea, Bart.*, (1 *Bos. & Pul.* 144 ;) in *Knox* v. *Goodwin*, (25 *Wend.* 643,) and in *Same* v. *Losee*, (2 *Barb. S. C. R.* 56.) This is the reason why, in making a loan, or in discounting a note, an agreement that the borrower should take post notes at par, has been considered usurious. (*Gaither* v. *The Farmers' and Mechanics' Bank of Georgetown*, 1 *Peters*, 57.)

All these securities for future payments, or things in action, may be loaned as money, at their present cash value, and to be the subject of such loans they must be reduced to that. But when a man makes and loans his own note, or money obligation, as present money, in such a manner as to pass the legal title and all the rights of a *bona fide* holder, to the borrower, the question of usury, so far as it is founded on any alledged depreciation of the value of the lender's note, apparently assumes a different aspect. The lender may not be in good credit. His note may not be considered worth its nominal value, by reason of his want of pecuniary responsibility or punctuality, and the borrower may be obliged to lose on the note, to obtain the money which was the desired object of his negotiation. But how does this benefit the lender? The note is valid against him for its whole amount, and he is legally liable to pay it with interest for his withholding payment, and it is not easy to perceive how, in contemplation of law, he can make more than the legal rate of interest by giving his own note and taking the note of another man for the same amount with interest for the same time and at the same rate.

Reference was made on the argument of the case before us, and particularly by the defendants' counsel, to the doctrine of the "*loan of credit ;*" but the opinion of the court of appeals, in the case of *The Dry Dock Bank* v. *The American Life Insurance and Trust Company*, and the cases therein referred to, as written by Judge Gardiner, and which has been published since the argument of this cause, as I understand them, render it unnecessary to examine that doctrine. If this transaction was, on the part of the Trust Company, simply a loan of credit,

it is not, according to that opinion, within the statute of usury. (*Dry Dock Bank* v. *The American Life Insurance and Trust Company*, 3 Comst. 354, *and cases referred to by Gardiner, J.*) The above general propositions, it is supposed, cover all the ground necessary to occupy in the more particular examination of the case before us.   In the examination of this case, the first question to be decided is, *was this transaction, on the part of the Trust Company, in substance and effect, a loan of money ?*

This is a question of fact to be determined on the evidence. The proofs on this subject are not prolix or intricate.   In the first place it is clearly proved that, at the time of the application of Mr. Seward, on behalf of himself and associates, to the officers of the American Life Insurance and Trust Company, for money, or means to procure money, or aid to raise money, (whichever it may be called,) to pay the Holland Company, as mentioned in the testimony of Mr. Seward, and in substance admitted by the whole case, one branch of the business transacted by the Trust Company, at New-York, was the loaning of money on bonds and mortgages and other securities, and that the company had given notice, in a pamphlet which it had published, that it loaned money on bonds and mortgages, that is, that it made loans upon unincumbered real estate, stocks and other securities.   It appears that Mr. Seward was associated with Abraham M. Schermerhorn, Trumbull Cary, Jared L. Rathbone and George W. Lay, in the contract with the Holland Company, for the purchase of the Chautauque property.   That by operation of the contract, he was agent and attorney of both parties, and had an office and did business in connection with the Chautauque property, at Westfield, in Chautauque county.   That it was soon discovered that the terms of the contract with the Holland Company, for the purchase of the Chautauque property, required payments to be made faster than the proceeds of the property would furnish means.   And the purchasers. *desired to obtain money* to pay the Holland Company, and other liabilities that Lay and others had incurred, and which rested on them and their associates.   That Mr. Seward went to New-York in 1837, for the purpose of raising *funds* for his associates and himself,

Schermerhorn *v.* American Life Ins. and Trust Co.

to pay on their contract with the Holland Company, and was there repeatedly and long on that business.' Mr. Seward is not certain that he made applications for loans in more than two places, yet he thinks it likely he did. He knew, at that time, John Duer and Morris Robinson, and then learned that they had some connection with the American Life Insurance and Trust Company, and that the company had an office in New-York. Mr. Seward says he was there to *get money, to get money somehow,* and he understood that the company assumed trusts and advanced money on them. He communicated to the officers of the company his *desire,* on behalf of himself and associates, to *raise money,* and went on one. or more occasions before the committee or committees of the company, and conversed with them on *the subject,* before any arrangement was consummated between him and the company. In these preliminary negotiations Mr. Seward received encouragement that on perfecting arrangements to establish suitable correspondents in London, the company would be able to take a deposit of the Chautauque estate, and advance, by their certificates or bonds, *the funds* necessary to pay for it, and to pay the other liabilities of the associates. While this general arrangement was under negotiation, and about the month of September, 1837, an arrangement was made and concluded, under which certificates, of the form and character hereinafter mentioned, were issued to Mr. Seward and his associates, for the nominal amount of twelve thousand pounds sterling, and for the payment of which, Mr. Seward and his associates gave their bond. These £12,000 of certificates were issued in view of the further arrangement to be afterward effected, and which was to absorb that amount. After this Mr. Seward continued negotiations with the American Life Insurance and Trust Company, for the purpose of raising a further *amount of money,* and in the course of that year and the next, an arrangement was perfected for the advance of a further amount of certificates, the general features of which were, that the American Life Insurance and Trust Company should advance certificates to an amount sufficient to enable Mr. Seward and his associates to pay off their debt to the Holland Company, and by performing their ex-

ecutory contract with that company, to obtain an assignment of the Chautauque estate, which was to be conveyed to John Duer, Morris Robinson and William H. Seward, in trust, first, to pay the American Life Insurance and Trust Company its advances, with interest and charges, and then to be conveyed to Mr. Seward and his associates. This arrangement was executed in July, 1838, on the part of the Trust Company, by its issuing to or for Mr. Seward and his associates a further quantity of certificates, to the amount of £35,700, making in the whole amount of certificates issued by the Trust Company to Mr. Seward and his associates the nominal sum of £147,700 sterling, and on the part of Mr. Seward and his associates by simultaneously giving their respective bonds to the Trust Company, payable at the city of New-York in ten years, with interest, at the rate of 7 *per cent per annum,* payable semi-annually, for the proportion which each was estimated to owe the Trust Company for its advances of certificates, interest thereon, and its expenses, amounting in the aggregate to the whole sum claimed by the Trust Company for its certificates, interest thereon and expenses ; by selling all the certificates so received from the Trust Company, to Nicholas Biddle, Esq. at $4,44 to the pound sterling, and receiving for the proceeds a certificate of deposit in the Bank of the United States of Pennsylvania, payable in six months, without interest, which, after being subject to a deduction of $18,258,35, on account of its not being on interest, was turned out to the Holland Company by Mr. Seward and his associates, in performance of their contract for the purchase of the Chautauque property, and the property by their direction, conveyed to John Duer, Morris Robinson and William H. Seward, to secure the payment of the bonds given by Mr. Seward and his associates to the American Life Insurance and Trust Company. This agreement, for the advance of the certificates, was made by Mr. Seward on behalf of himself and his associates, on one part, and the officers of the Trust Company, and principally by Mr. Duer as vice president, at the office of the company in New-York, on the other part, in compliance with Mr. Seward's strongly expressed and frequently repeated *desire to raise money*

to pay on the contract of himself and his associates, with the Holland Company. The objects and purposes of Mr. Seward, and the use which he proposed to make of the certificates, being, all the time, well known to the officers of the Trust Company; and whatever the transaction may now be called, it seems to be almost impossible to contemplate it in any other character than as a loan of money, advanced in the company's certificates of deposit. It was evident to both parties, that the object which Mr. Seward and his associates so strongly desired, could be accomplished only by the payment of money, and those certificates were good for nothing only as the representatives of money or the means of raising money, and they were substituted for money at the suggestion of the Trust Company, and in compliance with the desire of the associates to raise money. It was not necessary to constitute a usurious agreement that the application should have been expressly or directly for a loan of money. The law regards the nature and substance of the agreement rather than the name which may be given to it or the terms in which it may be expressed. (*Baker* v. *Van Somer*, 1 *Bro. Ch. Rep.* 147. *Parker* v. *Ramsbottom*, 3 *Barn. & Cr.* 267. *White* v. *White*, 4 *Id.* 273. *Barnard* v. *Young*, 17 *Ves.* 44. *Carroll* v. *The Farmers' Loan and Trust Company*, 5 *Barb.* 613; *Welles, J.,* 653 to 656. *The Dry Dock Bank* v. *The American Life Insurance and Trust Company*, 3 *Sandf. Rep.* 262. *Per Cady, J.,* 3 *Comst.* 362 to 369; *per Gardiner, J., Id.* 359.) After examining the transaction in all its aspects, we have come to the conclusion that it was in substance and effect a loan of money, by the Trust Company, advanced in the company's certificates of deposit, at the rate stated, the payment of which, with interest at the rate of *seven per cent per annum,* payable semi-annually in New-York, was secured by the individual bonds of the borrowers, and a pledge of the Chautauque property.

This brings us to a consideration of the important question, whether the certificates of deposit advanced by the Trust Company to Mr. Seward and his associates were estimated, counted or passed, at more than they were worth in money at the time and place of the loan. Perhaps we might with propriety have

rested our decision of this question upon the express testimony of the witnesses on the subject, who concur in testifying that the certificates issued by the Trust Company were not worth their nominal value in money, either here or in England; but we have felt that the question demanded a further examination. In considering this branch of the subject we have not bestowed a particular attention upon the loan of the first £12,000 of certificates, as separate from the rest, because we thought that the proof tended to show that the advance of the £12,000 was made in anticipation of the completion of the arrangement for a loan of a larger sum, and to be absorbed in the general arrangement, and was so absorbed when that was completed, and thereby lost its separate character. The certificates advanced or loaned by the Trust Company, respectively purported to certify that some person, therein named, had deposited with the American Life Insurance and Trust Company the sum of one thousand pounds sterling, for the period of twenty years, commencing on the 15th day of January, 1838, and ending on the 15th day of January, 1858, and irredeemable for that period. Interest to be paid thereon by the company, half-yearly, on the 15th day of January and July, at the rate of 5 *per cent per annum*, upon the presentation of a warrant annexed to the certificate, at the agency office of the company in London. At the end of the term of deposit the said principal sum, with the interest then due, to be paid to the person named as depositor, or his order, at the said agency office, upon the surrender of the certificate. The certificates purported to be attested, in behalf of the company, by their president and secretary, at Baltimore, and to be signed P. Macaulay, president, R. D. Wilson, secretary. Some of them per John Duer, vice president, and some by M. Robinson, vice president; and all the interest warrants were signed N. Thurston, ass't sec'y. The whole nominal amount of these certificates issued by the Trust Company to Mr. Seward and his associates was *one hundred and forty-seven thousand, seven hundred pounds sterling*, and they were issued, estimated and delivered, at the rate of six per cent on $4,44 to the pound sterling, or at about $4,71 to the pound. This renders it necessary to inquire into the value of

the pound sterling, in England and in this country. Jacob, in his law dictionary, defines "pound in money," to be twenty shillings, and remarks, that in the time of the Saxons, it contained 240 pence, as it does now, and 240 of those (silver) pence weighed a pound, but 720 scarce weigh so much at this day, and refers to Lambard, 219. Christian, in his note 17 to 1 *Black. Com.* 277, says, "From the conquest till 20th year of Edward 3d, a pound sterling was actually a pound, Troy weight, of silver, which was divided into twenty shillings. About the year 1347, Edward 3d coined twenty-two shillings out of a pound, and five years afterward he coined twenty-five shillings out of the same quantity. Henry 5th, in the beginning of his reign, divided the pound into thirty shillings. Henry 8th increased the number to forty, and in the beginning of the reign of Elizabeth, she coined a pound of sterling silver into sixty-two shillings." Still a pound has always been and still is twenty shillings; but there is no coin there by the name of pound; it is now a mere imaginary currency, or a term used to represent the aggregate of twenty shillings; in this sense it is extensively used in our commercial intercourse with England. The par, equal or equivalent value of a pound sterling, or the value represented by pound sterling, in our money, has, in effect, been long established by acts of congress. By the act of August 4, 1790, (1 *U. S. Stat. at Large,* 134,) providing, among other things, rules for estimating the *ad valorum* rates of duties at the place of importation, and the rates of foreign coins and currencies, ($$ 39, 40,) it was declared by section 40, that foreign coins and currencies should be estimated at the following rates: "Each pound sterling, of Great Britain, at $4,44." By the act of March 2d, 1799, to regulate the duties on imports and tonnage, (1 *U. S. Stat. at Large,* 627,) it was provided by section 61, that the mode of estimating *ad valorum* rates of duties, should be by adding 20 *per cent* to the actual cost, in some specified cases, and 10 *per cent* in others; and that all foreign coins and currencies should be estimated at the following rates: "Each pound sterling, of Great Britain, at $4,44." Mr. Colden, in his argument of the case of *Hendricks* v. *Franklin,* in 1809, (4 *John.* 119,) remarked that the bill on

which the suit was brought being payable in sterling, which was an imaginary currency, the question was by what standard a pound sterling should be measured, and referred to the act of congress relative to the collection of duties as establishing the value of a pound sterling at $4,44, and added that, though contained in the act for the collection of duties, the regulation was general.

In this case, there was no dispute about the value of a pound sterling; it was in substance conceded by the counsel on both sides, and by the court, that the *par* or real value of a pound sterling, in New-York, was $4,44, but the plaintiff, being the holder of a dishonored bill drawn by the defendant, in New-York, upon a house in Liverpool, claimed to recover, over and above the real par value of the bill, the interest upon it and 20 per cent for his damages, the rate of exchange, or the price which a bill on Liverpool would cost at the time this bill was dishonored, and notice thereof given. The court allowed him the value of the dishonored bill, at the *par* of exchange as established by congress or $4,44 to the pound the interest thereon, and 20 *per cent* for his damages, but refused to allow him the rate of exchange. This case, so far as it related to damages on a dishonored bill of exchange, was, in substance, overruled by the court for the correction of errors, in the case of *Graves* v. *Dash*, decided in 1814, (12 *John.* 17,) in which the court, by a majority of 11 to 10, decided that the holder of a bill of exchange, drawn in New-York on England, and returned protested, was entitled to recover the contents of the bill and rate of exchange, or the price of bills on England, at the time of the return of the dishonored bill and notice thereof to the drawer, together with 20 *per cent* damages and interest; but that case did not deny that the established value of the pound sterling, in this country, was $4,44. The same fact was directly admitted in the case of *Martin and others* v. *Franklin*, decided at the same term with *Hendricks* v. *Franklin*, (4 *John.* 124,) and by the same court in the case of *Scofield and Taylor* v. *Day and Gleston*, in 1822, (20 *Id.* 102,) and by the supreme judicial court of Massachusetts, in the case of *Adams* v. *Cordis*, decided in 1829, (8 *Pick.* 260, 267.) Judge Story, in the edition of his commentaries on

Schermerhorn v. American Life Ins. and Trust Co.

the conflict of laws, revised by himself in 1841, and published in 1846, at section 308, expressly asserts, that the present *par* fixed by law between the two countries, (England and the United States,) is to estimate the pound sterling at $4,44, and in a note he adds, " This is the par for ordinary commercial purposes, but refers to more recent acts of congress fixing a higher rate in estimating the value of goods paying an *ad valorum* duty. These references it would seem must be sufficient to establish the legal proposition, that at the time of issuing the sterling certificates by the Trust company, $4,44, or according to some witnesses $4,44⅓, in the money of the United States, was the true and legal value of a pound sterling in this country. But it appears that the Trust Company demanded a premium of 6 *per cent* on this *par*, to provide for the exchange, or to make $4,44 equal to a pound sterling, in England, where the certificates were to be paid. Much testimony was taken in the case on the subjects of exchange with England, and the value of a pound sterling, when represented by a British sovereign, from which it appeared that in England gold alone was a tender for all sums over certain specified small sums of about $5,00. That a sovereign was equivalent to a pound sterling, there, and in this country, according to the rates of exchange, was worth more than $4,71 at the time of disposing of the certificates of deposit to Mr. Seward and his associates, and at the time of taking the testimony was equal to $4,85, and that it would cost $4,85 in our money to pay a pound sterling, in London; though it was admitted that all calculations of exchange, or the cost of paying money in England, was based upon the assumption that $4,44 was the *par* of a pound sterling here, and that the discrepancy between the value of the two currencies, and the expense of trans-mitting the funds was provided for in a premium upon that par. Still the law fixing the value of a pound sterling at $4,44, had not been altered at the time of the transaction referred to by this case. A pound sterling could then be paid here, unless due on a dishonored bill of exchange, by $4,44 in our currency. These certificates of deposit were based entirely on the respon-sibility of the Trust Company, and if the payment of the inter-

est or the principal in London had been neglected, and the vouchers returned and prosecuted here, the cases of *Martin and others* v. *Franklin,* and *Scofield and others* v. *Day and others,* are direct authorities to show, that, in this state, the holders · would recover no more than their value at the rate of $4,44 to the pound sterling, and the interest thereon. These decisions were quoted with approbation, and adopted by the supreme· court of judicature of Massachusetts, in 1829, (8 *Pick.* 267.) If the principle adopted by these decisions is correct, then the Trust Company, on the return of the certificates, or the interest · warrants, unpaid, could discharge themselves from further liability on them here, by tendering the amount due at $4,44 to the pound sterling. But if this transaction between the Trust Company and Mr. Seward and his associates, really and necessarily included the exchange, or the expenses of transmitting the funds to London, there is no proof that the premium charged for it was too high: We do not intend to intimate an opinion, nor is it necessary to do so in this case, that where an application is made for a loan of money, to be transmitted to England, by the lender, for the benefit of the borrower, a·charge for the real and *bona fide* expenses of the exchange or transmission of the funds, added to the sum loaned here in our country, would necessarily render the transaction usurious. In the case under consideration, the well known and frequently expressed desire of Mr. Seward and his associates, was to obtain money to pay the Holland Company, at Philadelphia, and save their contract for the Chautauque property. That for this purpose the value of the sterling certificates, in American currency, at $4,44 to the pound, the price at which they were actually sold to Mr. Biddle, would have answered their purpose of payment, and saved the premium which they had to pay for exchange on England, and considering the uncommercial and unsaleable character of the certificates ; that they were not subject to the known rules of exchange ; that they were not made payable in London at the request, nor for the benefit of the borrowers ; that all the payments of interest by the Trust Company in London were to be preceded by payments to them here to a much greater

amount, and that the principal was to be paid to the Trust Company here, ten years before they were to provide for the payment of the certificates at London, there appears to be very little reason for charging the borrowers with a premium for the actual, necessary, or desired transmission of the money to London, 20 years thereafter; and as the premium was of no benefit to the borrowers, but was a profit to the lenders, by passing through the hands of their own correspondents or agents, we feel ourselves bound to regard this provision in the contract for the loan, as based upon a business theory which it was not necessary to adopt in practice, and being unnecessary, was not contemplated; and therefore included in the contract as a pretense for demanding 6 *per cent* more than the real value of the certificates loaned, and by which the Trust Company did receive or reserve about $39,386,67 more than the money which they actually parted with, and the interest thereon, and which must be imputed to a contrivance or design to get that much more than the legal rate of interest on the money actually loaned.

It is still more difficult to sustain that provision of the contract of loan, which limits the interest to be paid on the certificates to 5 *per cent per annum.* We have considered the original application of Mr. Seward on behalf of himself and his associates, to the American Life Insurance and Trust Company, in substance, an application for a loan of money, to pay to the Holland Company, and that the Trust Company, to gratify the desire expressed in that application, proposed to loan, and Mr. Seward consented to accept, in lieu of money, the company's certificates of deposit. The question now is, whether the certificates of deposit were loaned or passed to Mr. Seward and his associates, at their fair money value, at the time and place of the loan. The contract of loan was made in New-York, where there legal value of the use of money was 7 *per cent per annum,* between parties who were, in substance, citizens of this state. The certificates of deposit, which pledged nothing but the responsibility of the Trust Company, were issued and delivered in New-York; and the repayment of the nominal sum mentioned in the certificates at $4,71 to the pound sterling, with interest

at the rate of 7 *per cent per annum*, payable semi-annually, was to be made in New-York, and it seems to us that the contract was, in all respects, a New-York contract, and governed by the laws of New-York. Now, admitting that the certificates loaned were truly estimated or valued at $4,71 to the pound sterling, and that they were considered to be as good as money at the time of payment, were they not intrinsically diminished below their money value, at par, at the place of the loan, by the limitation of the interest on them to 5 *per cent per annum?* Interest, at the rate allowed by law, is the legal fruit of money. The owner of money has as good right to the interest as he has to the principal, and the lender of money has no more right to stipulate that the borrower shall relinquish the interest on the money borrowed, than he has that he shall relinquish a corresponding amount of the money. If the loan was made in goods, or things in action, any condition attached to their absolute dominion and enjoyment would diminish their value; and if the diminution was designed to operate in favor of the lender, it would be considered that he retained so much of the value of the property which he professed to turn out as money on the loan; and the question in such a case would be, *was* what he *did* turn out worth what it was estimated at? This question is not evaded or answered by showing that the legal rate of interest in England is 5 *per cent per annum*, and that the certificates were made payable in London. This only suggests the inquiry, by whom and for whose benefit they were made payable there. There is no proof that they were made payable in London, at the suggestion or for the benefit of the borrowers. This inquiry only includes the value of the certificates as money, and is not necessarily influenced by the legal rate of interest in England or this country. The Trust Company might have made those certificates of deposit payable in New-York, at 5 *per cent per annum*, as well as at London; and the inquiry then would have been, as it is now, what was the value of the certificates in money, and was their value diminished by the fact that the interest which they bore was limited to 5 *per cent?* Nothing can be claimed by the Trust Company, in this estimate, on the

ground that the money was worth more in London than New-York, because the expense of sending it there had once been paid by the borrowers in the premium charged on the *par value of the certificates*. By this view of the subject, it appears that the certificates of deposit were less valuable than the money would have been, at the time and place of the loan, by 2 *per cent per annum* on the whole sum loaned for the period of 20 years, on the supposition that the loan continued for that time, and that the Trust Company were the gainers to the same amount. But the loan was to be continued but 10 years, as against Mr. Seward and his associates. True, the Trust Company had 20 years in which to pay the sum loaned, but the borrowers were to pay the whole sum borrowed, with interest at the rate of 7 *per cent per annum*, payable semi-annually, at the end of ten years. At that time they would cease to sustain the relation of borrowers or debtors to the Trust Company, or to have any of their money. From that time forward, for 10 years, it is presumed that the interest of the money paid on the loan would at least be equivalent to the interest on the certificates of deposit. So that the benefits or advantages of the provision or stipulation alluded to were, in fact, to be received by the Trust Company within the 10 years during which they parted with their money, or really stood responsible for the sum loaned. For that time, if the value of the use of money or interest to the borrowers is to be estimated at 7 *per cent per annum*, the rate allowed by the law of the place where the parties resided, where the loan was made, where the money borrowed was to be used, and where it was to be repaid, the reservation stipulated for at 2 *per cent per annum* for 20 years would be equal to 4 *per cent per annum* for the 10 years, and, in the aggregate, would amount to about $278,266,00; which sum the Trust Company, according to the plan of the said loan, would have received at the end of ten years, without having advanced or being liable thereafter to advance one dollar.

When we consider that this provision was directed by the Trust Company, and designed to operate for their benefit, and could not operate for the benefit of Mr. Seward and his associates,

we fully concur in the opinion of the supreme court of the seventh district on a similar question, (5 *Barb.* 657,) and find ourselves compelled to declare the last provision of the contract referred to, usurious on the part of the Trust Company.

It cannot alter the nature of this transaction to call it a deposit of the Chautauque property, and the issuing of certificates of deposit upon that property, to raise the money to pay for it. If there was any usury in the matter, it was in the price which the Trust Company demanded for the money which they advanced, and not in the deposit or security which they received for its repayment. Take the hypothetical case presented by one of the counsel for the defendants, on the argument, thus : " If a man deposits with me, or pledges to me, a bond and mortgage for $500, against a third person, and I give him a certificate of deposit for $100, payable in one year, with permission to retain the $100 out of any money collected on the bond and mortgage ; clearly, this is no loan of my certificate, which is a mere contract to pay $100, in consideration of the pledge and transfer of $100, out of the bond and mortgage." This is all simple and true ; but if the agreement in the supposed case had been that, for the $100 which my friend advanced on the deposit of the bond and mortgage, he should have stipulated for permission to retain, out of the proceeds of the bond and mortgage, the sum advanced, with interest thereon at the rate of 20 *per cent per annum*, would not the pledgee of the bond and mortgage have some reason to fear that the terms upon which he parted with his money would be considered usurious, and the deposit or pledge for the repayment of it void ? All that he would have done, in that case, would have been to advance his needy friend $100, and taken a contract for the repayment of it, with 20 *per cent* interest. If, instead of money, he had made the advance in goods, or things in action, at 20 per cent more than they were worth, the effect would have been the same. The only difference between the two cases would have been that, in the first case, the usurious rate demanded for the use of the money would have been evident upon the face of the agreement, and in the other it would have been disguised under an over

valuation of the property. In the case under consideration, the advance was made in the certificates of deposit, valued as money, and the repayment of the sum at which they were estimated, at a certain specified time, with interest, was provided for by the contract. That sum was claimed to be the sum advanced to Mr. Seward and his associates; and whatever the future value of the deposited property might be, that debt was to be paid, and its payment was secured by the individual bonds of the debtors, to which the deposit or declaration of trust was in terms secondary and collateral. It is clear that the contract, on the part of the Trust Company, was, in substance, a loan or forbearance of the debt due for the certificates; and if it attempted, directly or indirectly, to secure a greater rate of interest for the loan or forbearance than at the rate of 7 *per cent per annum*, all the contracts, securities and deposits taken for that purpose, are void by statute.

After having examined this case with a degree of care proportioned to our appreciation of its importance, we have unanimously come to the conclusion that the contract referred to in the pleadings and proofs, is, on the part of the American Life Insurance and Trust Company, as against the plaintiff, usurious and void.

That the bond given by the plaintiff to the American Life Insurance and Trust Company, and set forth in the plaintiff's complaint, must therefore be declared void, as against the plaintiff; and if in the hands of any of the defendants in this suit, must be given up and canceled.

That the trust claimed and attempted to be raised in favor of the American Life Insurance and Trust Company, upon the deed from the Holland Company to John Duer, Morris Robinson and William H. Seward, and set forth in the pleadings and proofs, as against the plaintiff, be declared void. And that the said John Duer, Morris Robinson and William H. Seward, be directed to convey to the said plaintiff his share, interest or portion of all the property claimed by them under or by virtue of the said deed, free and clear from such pretended trusts, and all interest or estate claimed under such deed; and that they render a true account to the said plaintiff of all such money or property

received by them under such trusts, and pay the same over to the said plaintiff.

That all other defendants in this action who shall appear to have received any money or property belonging to the plaintiff, by, from or under the said John Duer, Morris Robinson and William H. Seward, or by, from or under the American Life Insurance and Trust Company, or any of its officers or agents, render an account for and pay over the same to the said plaintiff. That if it shall appear necessary, the plaintiff may apply, by motion, for a receiver. That the decree in this action shall be settled before one of the justices of the court. And that the plaintiff shall recover his costs of this suit against the American Life Insurance and Trust Company.

The following opinion, adopted by the court, was prepared and presented by Mr. Justice MARVIN, to whom the subject of which it treats was more specially referred:

It is stated in the complaint, that it is alledged by the corporation, that the plaintiff has by bankruptcy, or otherwise, parted with his interest in the subject matter of the action. The plaintiff, without admitting the allegation, avers that if he ever parted with his interest, he subsequently regained and became reinvested with the subject matter of the suit.

It appears from the testimony, that in January, 1843, the plaintiff presented his petition in the United States district court to be declared a bankrupt. It was verified before the deputy clerk of the district court. Proceedings were had, and the plaintiff was declared a bankrupt and was eventually discharged. He presented, with his petition, a schedule of his property and debts, in which he stated debt due to the Trust Company and the securities held by the company. Erasmus D. Smith was appointed assignee, and subsequently, upon a sale of the assets of the bankrupt, he sold and transferred to the plaintiff all his previous interest in the property, or subject matter involved in this suit.

The defendants' counsel objects that the plaintiff has no title

or interest, except such as he acquired at the sale made by the assignee in bankruptcy, and that the assignee and plaintiff both took subject to the trust and claim in favor of the defendants, and that the plaintiff cannot be regarded as a " borrower," within the law of 1837, and can therefore have no relief without paying, or offering to pay, the sum actually loaned.

The plaintiff, with other positions, insists that the proceedings in bankruptcy were void, that the court acquired no jurisdiction, and that there was therefore no transfer of the interest of the plaintiff to the assignee, upon the ground that the petition and schedule were not verified before any officer having authority to take the verification or to administer the oath.

In the view taken of this part of the case, it will not be necessary to examine this position of the plaintiff's counsel. It will be assumed that the proceedings in bankruptcy were regular, that the court had jurisdiction, &c. &c.

What were the rights, then, of the plaintiff? Is he a *borrower* within the contemplation of the act of 1837, § 4 ?(*a*) If he is to be regarded as a *borrower*, then he was under no obligation to pay or offer to pay any interest or *principal* on the sum or thing loaned, and the court is prohibited from requiring the payment or deposit of the principal or interest, as a condition of granting relief.

In *Livingston* v. *Harris*, (11 *Wend.* 329,) the bill was filed by the surety of the borrower, and Justice Sutherland, (p. 336,) entertained no doubt that he was to be considered a *borrower ;* and so Senator Tracy, (p. 342.) They gave the only opinions delivered in the court of errors. In *Post* v. *Bank of Utica*, (7

(*a*) That section is as follows: " Whenever any borrower of money, goods, or things in action, shall file a bill in chancery for relief or discovery, or both, against any violation of the provisions of the said title, or of this act, it shall not be necessary for him to pay, or offer to pay, any interest or principal on the sum or thing loaned; nor shall any court of chancery require or compel the payment or deposit of the principal sum or interest, or any portion thereof, as a condition of granting relief or compelling or discovering to the borrower, in any case, usurious loans forbidden by said title or by this act." (*Act to prevent usury, passed May* 15, 1837. *Laws of* 1837, *p.* 486. *Gen. Stat. vol.* 2, *p.* 1038. 2 *R. S. 4th ed. p.* 182.)

*Hill,* 391,) the bill was filed by the grantee of the mortgaged premises, alledging usury in the mortgage. It was held that he was not a borrower. In some of the opinions delivered it was said that the term borrower embraced the party to whom the loan was made, and his sureties, heirs, devisees and personal representatives.

In *Rexford* v. *Widger,* (2 *Comst.* 131,) the bill was filed by a mortgagee, to avoid a prior judgment, for usury, and it was held that the complainants were not borrowers, upon the authority of *Post* v. *The Bank of Utica.* In *Vilas & Bacon* v. *Jones & Piercy,* (1 *Comst.* 279,) Bronson, justice, expressed the opinion that the term borrower did not include the sureties of the borrower. Judge Gardiner expressed the contrary opinion. (*Id.* 288.) The case was decided upon other grounds; and so in *Livingston* v. *Harris,* the opinions of Sutherland and Tracy upon the question here referred to were not necessary to the decision of the case. I do not regard these cases as in point upon the question now under consideration. They have been referred to by counsel, and are here noticed as showing the construction which eminent judges have put upon the word borrower, in construing the statute. The question in the present case rests upon other principles. It is not denied that Schermerhorn once occupied the position of a borrower, but it is insisted that his present title, if any, is that of a purchaser from the borrower. In other words, the title to the things claimed in this action, having been vested in Smith, the assignee in bankruptcy, and the plaintiff, having purchased from Smith, he is to be regarded simply as a purchaser, without any regard to his previous character of borrower.

In my opinion, this position is not sound. The plaintiff is certainly within the letter of the statute. It describes him. He was the borrower, and can the fact that for a time he was divested of the title, deprive him of the character of a borrower?

A borrower upon bond and mortgage contaminated with usury, is within the statute. He may convey the land subject to the payment of the mortgage, and his grantee is not within the statute, nor can his grantee *defend* against the mortgage,

although the statute of usury has made the mortgage absolutely void. Why is this? The borrower may always, if he choose, pay the usurious loan; and having paid it, he cannot recover it back. He may, when sued, suffer judgment, and the debt may then be collected. It is upon these principles that he may, in the case of a mortgage, sell and convey the premises mortgaged, subject to the mortgage. In other words, he sells the equity of redemption. He has the right to say that the land shall be first appropriated to the payment of the usurious mortgage, and his grantee cannot object to this appropriation, and cannot therefore even *defend* against the mortgage. (*See Green* v. *Kemp*, 13 *Mass. Rep.* 515; *Shufelt* v. *Shufelt*, 9 *Paige*, 145; *Ridge* v. *Hubbard*, 15 *Mass. Rep.* 103; 2 *Hill*, 525, 6.) In these cases, it should clearly appear that the mortgagee or borrower has elected to affirm the usurious security, and that he intended to provide for its payment. In such a case, it would be inequitable that the purchaser should set up a *defense*, and thus derive a benefit by defeating the mortgage, for instance, which his grantee never intended he should have, and for which he has paid no consideration. But, in the case put, of the mortgagor selling the equity of redemption only, may he not interpose the defense of usury to the bond? Would he be estopped from defending because he had chosen to provide for the payment of the usurious loan out of the land? I think no one will contend this. When he has paid the actual amount loaned, he cannot collect it back. It is then beyond his control. But suppose he places the money in the hands of his agent, with directions to pay it to the lender, may he not, at any time before payment, countermand the directions, recall the money, and defend against collection? I think he may. Again, suppose in the case of the conveyance of the mortgaged premises subject to the payment of the mortgage, that the mortgagor purchases the land back from his grantee, and is again vested with the title, is he not restored to all his original rights? May *he* not set up the defense of usury to the mortgage? His grantee and now his grantor could not do so, because as to him, the mortgagor elected to provide for the payment of the loan out of the land; but this election

Schermerhorn *v.* American Life Ins. and Trust Co.

or provision was not payment; and when he, the mortgagor, again becomes vested with the land, he, in my opinion, may interpose the defense of usury. And being a *borrower*, he may avail himself of the provisions of the act of 1837. So in the case under consideration. Schermerhorn was the *borrower;* for a time, he parted with the title of the property demanded in this suit; and if it should be assumed that those to whom the title passed, could not avail themselves of the statute relating to borrowers, or that they could not even defend, it would not follow that Schermerhorn could not do so upon being reinvested with the title.

The assignee in bankruptcy could defend, and so could any person deriving title from him. The law vested the property of the bankrupt in the assignee, for the benefit of the creditors of the bankrupt, having *bona fide* debts, and no creditor, not having a debt or demand which he could enforce against the bankrupt, has any claim upon the property of the bankrupt.

The principle, which estops a grantee of mortgaged premises, subject to the payment of the mortgage, has no application to the case of assignments by insolvent debtors, or to the estates of bankrupts, proceeding under the act, for a discharge. (*Pratt* v. *Adams*, 7 *Paige*, 641. *Bankrupt act of* 1841, § 5.) The assignee in bankruptcy has no authority to pay usurious debts, and although he may not be regarded as a borrower, so as to enable him to resort to the remedy given by the act of 1837, still, in my opinion, the purchaser of the property from the assignee may avail himself of the provisions of that act, provided he was the *borrower*. In this case, Schermerhorn was the borrower. He comes within the letter of the act. There is no estoppel in this case. No one has been estopped from defending, and the plaintiff has now the title to the things demanded in the action, and he is the person described by the term borrower, in the statute. The objection cannot prevail.

[CHAUTAUQUE GENERAL TERM, September 6, 1852. *Marvin, Hoyt* and *Mullett*, Justices.]